UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOE,<br><br>    Plaintiff,<br><br>    v.<br><br>COUNTY OF SAN MATEO, et al.,<br><br>    Defendants. | Case No. 3:15-cv-05496-WHO<br><br>**ORDER GRANTING SANCTIONS FOR SPOLIATION**<br><br>Re: Dkt. No. 78 |

**INTRODUCTION**

This Order concerns the troubling failure of the County of San Mateo to preserve critical records that it was mandated to keep regarding the rape of a juvenile in its custody. Plaintiff Doe, a minor, was in the County's custody under the supervision of the Probation Department, housed at the County's Youth Services Center, when he was raped by his roommate on two separate occasions in December 2014. In discovery, Doe sought certain records that documented his assailant's housing classification, as well as his rooming assignments for the periods before and after the rapes occurred. Doe also requested recordings from video cameras that monitor the common areas of the housing unit, including the hallways outside the rooms.

The County produced some of the housing records, but was unable to locate the assailant's classification documents and rooming assignments for several weeks leading up to the dates the rape occurred, during which he was disciplined for several violent outbursts. It claims that the missing documents were turned over to the Sheriff's Office as part of its criminal investigation and cannot be located. As for the video recordings, it insists that no recordings ever existed. Doe highlights the deposition testimony from several probation officers and employees suggesting that there was no indication that the recording equipment was not working during the nights in

question, and the County failed to adequately attempt to retrieve (or preserve) any recordings once it was on notice that litigation was likely. He now seeks evidentiary sanctions, including an adverse inference instruction and an order precluding defendants from offering testimony as to the missing evidence.

Doe has not established that the County spoliated any video recordings and he has other evidence to prove the same point for which he would rely on the recordings. But he has shown that the County was at least grossly negligent in losing the housing records. Because the County had a duty to preserve the evidence, which is relevant to Doe's claim that the County acted with deliberate indifference to his health and safety, he is entitled to an adverse inference instruction. His motion for sanctions is GRANTED.

**BACKGROUND**

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Doe is a minor represented by and through his Guardian Ad Litem, Felipe Rodriguez pursuant to Federal Rule of Civil Procedure, 17(c). Order Granting Mot. to Appoint Guardian ad Litem (Dkt. No. 84). Doe was taken into custody on November 11, 2014 as a juvenile ward of Defendant County of San Mateo (the "County") under the supervision of the San Mateo County Probation Department ("Probation Department") and placed in the San Mateo County Juvenile Detention Facility known as the Youth Services Center ("YSC"). Second Am. Compl. ¶¶ 23, 25 ("SAC")(Dkt. No. 86). On December 1, 2014, defendants brought ward Christian Richardson to be housed with Doe in YSC housing unit Pine 5, room 110. SAC ¶ 25. According to Doe, Richardson had a history of violent outbursts and his mother warned the County that he was a "ticking time bomb." SAC ¶ 25.

The County is a public entity that owns and controls the Probation Department and the YSC. SAC ¶ 9. The individual defendants, Larry Silver, Cheryl Batiste, Dana Johnson, Brendan Ellis, and Alexander Volokitin, sued in both their individual and official capacities, are alleged to have acted within the scope and course of their employment as either officers or employees of the County. SAC ¶¶ 10-15. Silver, currently the Assistant Chief Probation Officer, was the Deputy Chief Probation Officer responsible for the administration and supervision of three Probation

2

Department locations—including the YSC—at the time of the assaults. SAC ¶ 10. Batiste is and was a San Mateo County Senior Probation Officer and was Richardson's probation officer. SAC ¶¶ 11, 27. Johnson, Ellis, and Volokitin are and were Group Supervisors with the YSC. SAC ¶ 12-14.

The present action stems from two separate incidents in December 2014 when Doe was physically and sexually assaulted by Richardson in their shared cell. SAC ¶¶ 37, 43.[1] As a juvenile ward in the custody of YSC, Doe maintains that the defendants had "a duty of reasonable care to protect [Doe's] safety and well-being." SAC ¶ 24. Doe alleges that defendants breached this duty, and as a result of their deliberate indifference to Doe's safety, health, and rights, are all "otherwise responsible in some manner for" Richardson's assaults of Doe. SAC ¶ 1-2, 18. Specifically, Doe contends defendants: (i) knew of Richardson's violent history both inside and outside of YSC—including his required participation in a sex offender program (SAC ¶¶ 25-29, 91); (ii) knew of the imminent danger that Richardson posed to Doe (SAC ¶¶ 25-30); (iii) failed to monitor Doe's safety—including failing to conduct cell checks every fifteen minutes on both nights of the assaults (SAC ¶¶ 38, 45) and failing to investigate visible bruising on Doe's face the morning after each assault (SAC ¶ 42); and (iv) failed to provide Doe with necessary medical care (SAC ¶¶ 47, 54–59). Further, Doe maintains that the deliberately indifferent conduct manifested by defendants was fostered by and allowed as a result of the policies, practices, and customs of the YSC. SAC ¶¶ 26-29, 31-34, 84.

On June 1, 2015, Doe filed a government tort claim with the County, which the County rejected. Hurley Decl. ¶ 14 (Dkt. No. 78-1). Doe filed this action on December 1, 2015. *Id*. ¶ 15; *see* Compl. (Dkt. No. 1).

## II. DISCOVERY

On March 11, 2016, Doe served the County with his Request for Production of Documents (RFPD) Set One, which included RFPD No. 6: "[a]ny and all DOCUMENTS, including but not

---

[1] Richardson was criminally charged and convicted for his assaults on Doe. Joint Case Management Statement at 2 (Dkt. No. 23).

3

1 limited to reports and notes, RELATING TO any investigation, whether formal or informal,

2 undertaken by COUNTY OF SAN MATEO, San Mateo County Sheriff's Office, and/or San

3 Mateo County Juvenile Detention Facility of the INCIDENT." Hurley Decl. ¶ 17; *id*., Ex. O (Dkt.

4 No. 79-7 at 9). The County responded that it "does not have access to the Sheriff's Office's

5 investigation because they are a separate entity from the Probation Department." *Id*. It produced

6 YSC "Journal Entries." *Id*.

7 Doe thereafter served the Sheriff's office with a subpoena for any and all documents

8 relating to the Sheriff's Office investigation of the incident. Hurley Decl. ¶ 19, Ex. L [under seal].

9 The County subsequently refused to produce the Sheriff's incident reports and other records

10 related to Richardson without a court order pursuant to Welfare and Institutions ("W&I") Code

11 section 827. Hurley Decl. ¶¶ 17(c), 20. On January 30, 2017, the San Mateo County Superior

12 Court granted Doe's W&I Code section 827 petition. Hurley Decl. ¶21, Ex. P [under seal]. The

13 files were delivered on February 16, 2017. Hurley Decl. ¶22, Exs. R, U, V, W, EE [all under

14 seal]. The documents did not include housing records for the months leading up to the assaults.

15 On March 29, 2017, the County produced documents in response to Doe's May 2016

16 subpoena. Hurley Decl. ¶23. A document entitled "Supplement 1," written by Sheriff's Office

17 Detective Joe Cang, states, "I later obtained documents showing where the victim and suspect

18 were housed during the week of 12/1/2014 to 12/7/2014." ("Supp. Report")(Hurley Decl. ¶ 23,

19 Ex. L [under seal]). The documents referenced by Detective Cang were not in the records

20 produced by the County. Hurley Decl. ¶ 23.

21 On May 4, 2017, Doe served the County with RFPD Set Two, including RFPD No. 48 and

22 No. 49, seeking all documents relating to the unit and room number assignment of youth

23 Richardson while housed by the County between September 1, 2014 and December 31, 2014.

24 Hurley Decl. ¶ 24, Ex. S (Dkt. No. 79-8 at 12). The County responded that it would "provide

25 responsive documents shortly, in due course." *Id*. On June 30, 2017, the County produced

26 documents indicating where Richardson was housed from December 7, 2014 through December

27 29, 2014, and on December 31, 2014. Hurley Decl. ¶¶ 25, 37, Ex. X (Dkt. No. 79-9 at 11).

28 Doe's counsel contacted County counsel about the missing records, and meet and confer

efforts took place from July 8 to 31, 2017. Hurley Decl. ¶ 27; Thompson Decl. ¶¶ 3–4 (Dkt. No. 78-2); *see* Hurley Decl. ¶ 27, Ex. T (Dkt. No. 79-8 at 14). On July 31, 2017, County Counsel sent a letter to Doe's counsel indicating that "the records are not in the possession, custody, or control of County Defendants." Dkt. No. 79-9 at 2. And further, "the Sheriff's Office advised us that it cannot locate the responsive documents in its possession." *Id*. at 3.

In opposition to Doe's motion, the County submitted several declarations from its employees. *See* Cubing Decl. (Dkt. No. 83-2); Espinosa Decl. (Dkt. No. 83-3); Johnson Decl. (Dkt. No. 83-4); Silver Decl. (Dkt. No. 83-5). The declarations purportedly outline the various steps defendants took to respond to Doe's RFPDs, but many of them contain information substantially different than—and even contrary to—the declarants' deposition testimony.[2] County Defendants insist that individuals provided the Sheriff's Office with any information and records they requested as part of the criminal investigation, and "did not discard or otherwise internally fail to preserve anything that would be relevant to the matter[.]" Opp'n at 4 (citing Silver Decl. ¶ 3; Espinosa Decl. ¶ 3). Included in the documents were several weeks' worth of "hall boards," the sheets of paper that reflect the youths' identities and housing units. Silver Decl. ¶ 6; Johnson Decl. ¶¶ 3–4; Espinosa Decl. ¶3. According to defendants, they have been unable to locate documents for the period of November 12 to December 8, 2014.[3] Silver Decl. ¶ 7; Johnson Decl. ¶ 4; Espinosa Decl. ¶ 4.

As for the requested video recordings, County Defendants insist that they attempted to retrieve any video footage, but "found nothing." Cubing Decl. ¶ 3. According to the County's Senior Information Technology Analyst, "[t]hat means that the recording function was not working, and there was no video to view, and never existed the moment after it appeared on the monitor in real time." *Id*. And further, "[w]hen the video system was replaced at YSC earlier this

---

[2] Doe raised several objections to the evidence. Dkt. No. 88. The declarations and the objections are discussed below.

[3] In preparing for this motion, defendants discovered that hall boards for the period of September 1 to November 11, 2014, and December 9 to 31, 2014 "had inadvertently not been produced." Levy Decl. ¶ 3 (Dkt. No. 83-1)(emphasis in original). Defendants redacted appropriate information and thereafter produced the documents. *Id*.

year, there was nothing in the hard drive of the DVR that would depict the images in the real time video monitoring for Pine 5 during the evenings of December 3-4 and 5-6, 2014." *Id*. ¶ 4.

**LEGAL STANDARD**

Courts are imbued with "certain implied powers" that "are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)(quoting another source). Included within these powers is the district court's "broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial." *Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980). "Thus, sanctions for spoliation of evidence may be imposed under the court's inherent power to manage its own affairs." *Hamilton v. Signature Flight Support Corp.*, No. C 05-0490 CW (MEJ), 2005 WL 3481423, at *3 (N.D. Cal. Dec. 20, 2005).

When the non-production or destruction of evidence is at issue, "courts have broad discretion in fashioning an appropriate sanction, including the giving [*sic*] an adverse inference instruction." *Id*. "A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Id*. (quoting another source)(alterations omitted). "After considering these factors, a court must then consider all available sanctions and determine the appropriate one." *Apple Inc. v. Samsung Elecs. Co.*, c 11-1846-LHK (PSG), 881 F. Supp. 2d 1132, 1138 (N.D. Cal. 2012). Courts make that determination by considering: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Hamilton*, 2005 WL 3481423, at *3.

**DISCUSSION**

Doe contends that the County destroyed or failed to preserve (1) housing records associated with assailant Richardson, and (2) security camera recordings from the common areas of Pine 5 outside the individual cell rooms. He seeks the following sanctions for spoliation of this evidence: an adverse inference jury instruction,[4] and an order precluding defendants from

---

[4] Doe submits the following proposed instruction:

> Defendants have failed to prevent the destruction of or preserve relevant evidence, including video recordings that would have shown the conduct of Defendants San Mateo County, Volokitin and Ellis on the nights in question. State and federal law required that Defendant Silver secure and collect such recordings immediately as part of the investigation, and for purposes of reporting to State and Federal regulators charged with protecting juvenile wards from serious injury and rape while in custody.
>
> This failure is known as the 'spoliation of evidence.'
>
> Defendants also failed to prevent the destruction of or preserve records including the records of where and with whom ward Richardson was housed for the month prior to the assaults on Plaintiff, records of housing assessments and classification records.
>
> I instruct you, as a matter of law, that Defendants failed to preserve evidence after their duty to preserve arose. This failure resulted from the Defendants' failure to perform their legal duty under State and Federal law, and their discovery obligations in this case.
>
> You may presume the following facts to be true and that Plaintiff has met his burden of proving the facts by a preponderance of the evidence:
>
> First, that relevant evidence was destroyed after the duty to preserve arose. Evidence is relevant if it would have clarified a fact at issue in the trial and otherwise would naturally have been introduced into evidence; and
>
> Second, the destroyed or lost evidence was favorable to Plaintiff; and
>
> Third, Defendants San Mateo County, Volokitin and Ellis failed to perform safety checks in a timely manner or with the care and attention that would have prevented the sexual assaults and beatings suffered by Plaintiff; and
>
> Fourth, that housing records and housing assessment and classification records would have established that Defendants did not perform required housing classification and housing assessments for Plaintiff's safety in the face of imminent threat of harm posed by

7

introducing any witness or expert testimony or evidence that defendants performed safety checks in a timely manner on the nights of the assaults. Defendants argue that Doe is not entitled to the requested sanctions because he fails to establish that (1) defendants had a duty to preserve and (2) that any video recordings ever existed. Opp'n at 1 (Dkt. No. 83). Defendants further contend that, even if spoliation occurred, Doe is not entitled to the requested sanctions because he offered no evidence that the defendants consciously disregarded an obligation to preserve, and he conceded in his motion that he has other evidence to establish the underlying points. *Id*. at 2.

## I. WHETHER SPOLIATION OF THE EVIDENCE OCCURRED

Doe must first establish that the County had a duty to preserve the evidence, that it was destroyed "with a culpable state of mind," and it "was 'relevant' to [Doe's] claim … such that a reasonable trier of fact could find that it would support that claim[.]" *Hamilton*, 2005 WL 3481423, at *3.

### A. Duty to Preserve

The County insists that Doe "argues in conclusory fashion" and "offers his subjective belief to infer that Defendants should have been on notice of a potential claim." Opp'n at 10 (citing Mot. at 17). It also focuses on the principle that a criminal prosecution does not trigger a duty to preserve. *See* Opp'n at 8 (citing *Conan v. City of Fontana*, 2017 WL 3530350, at *4 (C.D. Cal. Aug. 16, 2017)). But defendants mischaracterize Doe's arguments.

Doe does not rely on the criminal prosecution or his subjective belief. He points to the Department's own operation manual and the Prison Rape Elimination Act to support his assertion that defendants had a duty to collect and preserve records and evidence once they were put on notice that Doe had been raped, which was December 6, 2014, the day after the second incident. Hurley Decl. ¶ 10; *see* San Mateo County Probation Department, Juvenile Facilities Operations

---

Richardson to Plaintiff.

> Whether these findings are important to you in reaching a verdict in this case is for you to decide. You may choose to find all or one of them to be determinative, somewhat determinative, or not at all determinative in reaching your verdict.

Mot. at 1–2.

8

Manual, Policy re Death and Serious Injury of a Minor While Detained (Hurley Decl. ¶ 50, Ex. Z, Dkt. No. 79-9 at 17); Prison Rape Elimination Act, 28 C.F.R. § § 115.371, 115.387.

Defendants highlight that Doe submitted his claim to the County pursuant to the California Tort Claims Act on June 1, 2015, nearly six months after the incidents.[5] *See* Opp'n at 10. They state that by this time, they had already relinquished the documents to the Sheriff's Office. But the criminal investigation could not absolve the Department of its own obligation to preserve the records. Its own policy and the PREA regulations necessarily put the County "on notice that the records had potential relevance to litigation." *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991).

Moreover, this is not a scenario in which Doe is arguing that "*an arrest* invariably triggers a duty to preserve evidence of the arrest for potential civil litigation[.]" *Tchatat v. O'Hara*, 249 F. Supp. 3d 701, 708 (S.D.N.Y. 2017); *see id.* (noting that "no case law supports [that] notion"). Nor is it merely "the fact that a tort might have occurred[.]" *See Garcia v. United States*, 2014 WL 12709430, at *2 (C.D. Cal. Sept. 3, 2014)(finding that "cannot by itself be sufficient to place a defendant on notice of impending litigation."). Rather, the duties imposed by regulation and internal policy triggered the County's duty to preserve any and all evidence related to the two times that minor Doe was raped while in the County's custody.[6] *See Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 264 F.R.D. 517, 524 (N.D. Cal. 2009)("The duty to preserve evidence also attaches when 'a party should have known that the evidence may be relevant to future litigation.'"); *cf. Garcia*, 2014 WL 12709430, at *2 (finding no duty to suspend defendant's routine 30-day video erasure when it had no notice of future litigation). The County cannot legitimately deny its duty to preserve any relevant evidence.

**B.      Destroyed "with a culpable state of mind"**

Culpability does not require a finding of bad faith. *See Unigard Sec. Ins. Co. v. Lakewood*

---

[5] Defendants inaccurately compute this time frame as "nearly eight months after the events in question." Opp'n at 10.

[6] Doe also points to Silver's declaration indicating that he spoke with counsel "[w]ithin two-three days after learning of the alleged assault[.]" Silver Decl. ¶ 3. According to Doe, this provides independent proof that the defendants may have anticipated litigation. Reply at 14.

9

*Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 n.2 (9th Cir. 1992) (confirming district court's inherent power to sanction "not only for bad faith, but also for willfulness or fault by the offending party."); *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993)("Surely a finding of bad faith will suffice, but so will simple notice of potential relevance to the litigation.")(internal quotation marks omitted); *Apple*, 881 F.Supp.2d at 1147 ("All that the court must find is that [the spoliating party] acted with a 'conscious disregard' of its obligations."); *Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 264 F.R.D. 517, 523 (N.D. Cal. 2009)("A party's destruction of evidence need not be in 'bad faith' to warrant a court's imposition of sanctions."). Rather, "[t]his factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to breach a duty to preserve it, or negligently.'" *Hamilton*, 2005 WL 3481423, at *5 (alterations omitted).

### 1. Housing Classification Records, including "Hall Boards" and Assignment Evaluation Forms

Doe sought at least two types of housing classification records—room assignment boards, also known as "hall boards," and a classification form entitled "Juvenile Hall Room Assignment Evaluation Forms." Hurley Decl. ¶¶ 37–45; *see* Richardson Assignment Sheet dated 12/24/14 (showing Richardson housing from 12/6/14 through 12/24/14)(Hurley Decl., Ex. X); Dana Johnson Dep. at 103:9–22; *id*., Ex. 43 (describing familiarity with Room Assignment Evaluation Form through her role in admissions)(Hurley Decl., Ex. B).   The "hall boards," which indicated the youth rooming assignments, were printed out from an Excel spreadsheet. Johnson Dep. at 30:10–25 (testifying that the Room assignment board is "printed out"); *see also id.* at 32:15 (stating that the document "was usually in Excel"); Volokitin Dep. at 39:8–24 (indicating the forms were used to verify what rooms were occupied, "a spreadsheet that the staff on the housing would print out"); *id*. at 40:7–16 (referencing "Excel spreadsheet"); *id*. at 40:19–20 (indicating that the spreadsheets were stored "on the computer servers"). When housing assignment changes were made, those changes would be documented on the hall boards. Johnson Dep. at 41:24–42:3 (noting that reassignment documented on "room assignment board"); *id*. at 31:3–5 ("A lead staff would at the end of the shift type everything in and make sure if there's any changes").

10

In the briefing for this motion, the defendants focused only on the missing "hall boards" and attempted to excuse their own culpability by blaming the Sheriff's Office. They emphasize that they turned over the requested documents to the Sheriff's Office without making copies, the Sheriff's Office never returned the documents, and the Sheriff's Office is now unable to locate them. Silver Decl. ¶ 6; Johnson Decl. ¶¶ 3–4; Espinosa Decl. ¶ 3. Defendants insist that "[a]t no time did [anyone] intentionally destroy, hide, or otherwise cause the hall boards to be lost, destroyed or in any way made unavailable." Silver Decl. ¶ 8. As previously indicated, in preparing their opposition, the defendants discovered the hall boards from September 1 through November 11, 2014, and December 9 through December 31, 2014. Levy Decl. ¶¶ 2–4. They have since produced them. The only remaining outstanding hall boards pertain to the period from November 12 to December 7, 2014.

There are a few issues here. As a preliminary matter, *the County* is the responsible party here. Both the Sheriff's Office and the Probation Department are departments of *the County*. It cannot fob off its responsibility for preserving the evidence by arguing that one of its departments screwed up. Next, the Department's act of turning the hall boards over to the Sheriff's Office cannot possibly relinquish its independent duty to preserve the records. And finally, according to Deputy Cang's Supplemental Report, the Sheriff's Office only obtained the hall boards for the week of December 1 through 7, 2014. Cang Supp. Report at p. 3 (Hurley Decl. ¶¶ 19, 23; *id*., Ex. L [under seal]). Even accepting those hall boards as now "missing," defendants fail to directly address the absent hall boards for the period from November 12 to December 1.[7]

As for the other housing classification records, defendants completely neglected to mention them in their opposition. Doe indicates that the classification records were required after Richardson assaulted two individuals in separate incidents on October 30, 2014. Reply at 1. He also indicates that defendants kept records about their decisions regarding housing assignments when a ward was first admitted. Hurley Decl. ¶ 37–42; *see* Dana Johnson Dep. at 103:9–22; *id*.,

---

[7] During the hearing, defense counsel suggested that these records were likewise included in those turned over to the Sheriff's Office. But none of the evidence suggests these hall boards were turned over.

11

Ex. 43 (describing familiarity with Room Assignment Evaluation Form through her role in admissions)(Hurley Decl., Ex. B).

During the hearing, defense counsel represented that there were no classification records that were a part of either Doe's or Richardson's individual files. He further seemed to suggest that the classification records may have been included in the records turned over to the Sheriff's Office. The Supplemental Report from Detective Cang notes that "[h]ousing classification for the victim and suspect" were collected as evidence. Hurley Decl. ISO Reply ¶ 3; Cang Supp. Report at 4 (Hurley Decl., Ex. L [under seal]).

It remains unclear whether there are or were additional classification forms that were not a part of the evidence collected by the Sheriff's Office. Regardless, the County cannot avoid the following facts: certain records existed, it had a duty to maintain those records (regardless of whether the Sheriff's Office or Probation *possessed* the records), and the records cannot now be located. The County has at least acted with gross negligence in losing these records, which is "sufficient fault to impose sanctions." *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1074 (N.D. Cal. 2006).

### 2. Video Recordings

The issue of the video recordings presents a more difficult question. Defendants argue that Doe cannot establish that the County either destroyed or failed to preserve the Pine 5 security camera recordings for the dates pertaining to the assaults because no recordings ever existed. Opp'n at 12. Defendants insist that they attempted to retrieve video footage from the nights of the rapes, but found no recorded video for those dates. *Id*.

"One of the elements of a spoliation claim is that the party must demonstrate the evidence actually existed and was destroyed." *Conan v. City of Fontana*, 2017 WL 3530350, at *3 (C.D. Cal. Aug. 16, 2017). In an effort to establish this element, Doe points to testimony from Director Rod Moore, who was serving as the YSC's interim facility director in December 2014, indicating that "[v]ideo was recording in all the units."[8] Moore Dep. at 51:20 (Hurley Decl., Ex. I, Dkt. No.

---

[8] Although Moore later testified that he "do[es]n't know" whether the camera system was operating on December 5, 2014. Moore Dep. at 53:21–24.

79-6 at 12). According to Moore, no one ever told him that anything was wrong with the recording system. *Id*. at 52:11–23. He also denied that anyone ever asked him to retrieve the recording. Moore Dep. at 51:5–16; *id*. at 53:25–54:12; *id*. at 98:20–23 (Hurley Reply Decl. ¶ 4a; *id*., Ex. HH; Dkt. No. 87-1). But Silver testified that he asked Moore for the video and was told that it could not be retrieved because the system was failing. Silver Dep. at 61:14–62:13 (Hurley Decl. ¶52; *id*., Ex. H). Doe also points to the testimony of Inocentes Cubing, the person the county designated most qualified to testify regarding the video recording equipment, establishing that no one ever asked him for help retrieving recordings nor did anyone tell him they were unable to retrieve any recordings. Cubing PMQ Dep. at 86:19–87:10.

The declarations submitted by defendants in opposition to this motion appear to substantially change the story surrounding the video recordings. According to the declarations, Silver asked Johnson—not Moore—to retrieve the recordings. Silver Decl. ¶ 4. And Johnson now attests that "[a]t some point" Silver asked him to retrieve recordings from December 3 and 5, 2014, Johnson Decl. ¶ 2, even though he had previously testified that he had no recollection of anyone asking him to retrieve recordings from those nights. Johnson Ind. Dep. at 14:17–15:6; Johnson PMQ Dep. at 42:10–21, 43:23–44:3. He further testified that had someone asked him for the recordings and he found there were none, he would have written a report to document the lack of recording in writing. Johnson PMQ Dep. at 44:4–18. He now declares that he was asked, and he reported to Silver that there were no recordings from the nights in question. Johnson Decl. ¶ 2. But no report documents the lack of recordings from those nights, including Silver's investigative report. Hurley Decl. ¶56; *id*., Ex. M (1/16/15 Silver Report). The report states that "Deputy Chief Silver and Director Moore discussed the incident and reviewed the PREA Protocol to ensure all parties were notified and that all appropriate steps were taken." *Id*. (Dkt. No. 79-6 at 28). The report mentions nothing about any attempt to recover video recordings.

Cubing now attests that the video recording function was "inconsistent," Cubing Decl. ¶2, whereas he previously testified that he was not aware of any problems with the recording system. Cubing PMQ Dep. at 34:3–6; *id*. at 55:7–12; *id*. at 70:4–15. Indeed, he testified that the recording system was working. *Id*. at 52:24–53:1 (indicating that the cameras recorded 24 hours a day); *id*.

at 79:16 – 80:1 (agreeing, at least in theory, that the Pine 5 video recordings should be stored on DVR); *id*. at 44:4–8 (testifying that the recording system was working in 2013)(Hurley Reply Decl. ¶ 4d; *id*., Ex. KK). He also contends that an unnamed institution services manager checked for video soon after the rapes but found nothing, Cubing Decl. ¶ 3, in direct contradiction to his earlier testimony. Cubing PMQ Dep. at 54:19–55:5; *id*. at 85:23–87:10.

Doe argues that these attempts to substantively change the testimony from three deponents amounts to a violation of Federal Rule of Civil Procedure 30(e), and the affidavits should be evaluated under the sham affidavit rule. "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012). "In order to trigger the sham affidavit rule, the district court must make a factual determination that the contradiction is a sham, and the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id*. (quotation marks omitted).

The inconsistencies in the declarations are troubling, but not so "clear and unambiguous" that they should be stricken under the sham affidavit rule. It is possible that, at the time of the depositions, the deponents were unclear whether the video monitoring system was actually recording during December 2014 and some subsequent investigation made it clear that no recordings were ever made. It is also possible that recordings were made and then destroyed. This latter possibility seems a bit less likely; the defendants would gain little or nothing by destroying the recordings, especially considering the existence of other evidence clearly establishing that they failed to conduct timely safety checks.

Under these circumstances, Doe has not met his burden to show that spoliation actually occurred. *See Jacobsen v. California*, 2017 WL 2654749, at *2 (E.D. Cal. June 20, 2017)("Before the elements of a spoliation claim can be evaluated, it is fundamental that the party seeking sanctions establish that the evidence in question actually currently exists in an altered form, or previously existed. This is an essential prerequisite to any spoliation claim… ."). Even if he had met his burden, the existence of the safety check logs negates the need for an adverse instruction on this issue. *See* discussion below.

### C. Relevant and Supportive

Doe contends that the housing records would support his deliberate indifference claim because they could "provide further evidence of [d]efendants' awareness of Richardson's dangerous propensities before [d]efendants placed Richardson in a cell with [p]laintiff." Mot. at 15–16. He also asserts that the video recordings would show that the defendants failed to perform their required 15-minute checks. Hurley Decl. ¶ 49; *see also* Silver Dep. at 66:15–19; Moore Dep. at 56:3–15.

Defendants do not appear to contest the relevance of the "missing" evidence, but they contend that the missing records would probably not be helpful to Doe. They highlight the hall boards for the period after Richardson got into two fights with peers, October 30 to November 12, 2014, which "do not indicate that Richardson was determined to be dangerous, or prohibited from having a roommate, or otherwise requiring special housing protocols during that time." Levi Decl. ¶4; *see id.*, Ex. A (Dkt. No. 83-1).

But this mischaracterizes the record. Group Supervisor Dana Johnson testified that Richardson was housed by himself for "a nice long time" following the October 30th assaults, at least "more than two weeks." Dana Johnson Dep. at 41:2–13 (Hurley Decl., Ex. B). And the evidence shows that Richardson was placed on 72-hour "Disciplinary Room Restriction" as a result of his assaults on other wards. *See* Hurley Decl. ¶ 7; *id.*, Ex. J (Dkt. No. 78-1[exhibit under seal]). On November 2, 2014, he demonstrated "extreme defiance which resulted in mechanical restraints" and probation staff recommended he not be allowed to go to school. Hurley Decl. ¶ 32; *id.*, Ex. U [under seal]. On November 4, 2014, his mother emailed probation officer Batiste to tell her that she feared her son was a "ticking time bomb." Hurley Decl. ¶ 8; *id.*, Ex. K. And on November 9, 2014, an employee noted that he threw his food tray out of his cell. Hurley Decl. ¶33; *id.*, Ex. V[under seal]. This is at least enough to show that a reasonable factfinder would find that the missing evidence documenting Richardson's housing assignments during this time would support Doe's claim.[9]

---

[9] This conclusion is not altered by the fact an unknown probation employee designated Richardson a youth helper on November 25, 2014. Hurley Decl. ¶ 34; *id.*, Ex. W[under seal]; *see also* Dana Johnson Dep. at 42:8–43:11. Defendants submitted a declaration from Gary Espinosa, an

15

As for the video recordings, defendants do not argue that the recordings would not be helpful to Doe; rather, they insist that he has other evidence establishing that the 15-minute checks were not conducted as required. This argument is addressed below, in the discussion on prejudice.

## II. WHETHER THE REQUESTED SANCTIONS ARE APPROPRIATE

Once a court determines evidence has been destroyed, it must determine the propriety of sanctions on a case-by-case basis. *Unigard,* 982 F.2d at 368. It may look to the following factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Hamilton*, 2005 WL 3481423, at *3.

### A. Degree of Fault

Defendants insist that they "dutifully attempted to collect and preserve any documentation, information, and/or evidence that they thought might be relevant to the alleged assault and/or Sheriff's Officer's criminal investigation." Opp'n at 15. Even accepting their lack of bad faith, the lesser degree of fault associated with negligent acts is sufficient in some cases to justify an adverse inference instruction. *See In re Napster*, 462 F. Supp. 2d at 1066 ("A party's destruction of evidence need not be in 'bad faith' to warrant a court's imposition of sanctions."); *id*. at 1078 ("Hummer's conduct amounts to gross negligence, if not willfulness, which is sufficient culpability to justify an adverse inference."). Given the County's undeniable duty to preserve such records under these circumstances, its gross negligence in failing to do so is an adequate degree of fault to justify the imposition of sanctions.

### B. Degree of Prejudice Suffered

"The prejudice inquiry looks to whether the spoiling party's actions impaired the non-spoiling party's ability to go to trial or threatened to interfere with the rightful decision of the

---

Institutions Servicers Manager, who attested that "[t]he Pine 5 Group Supervisors" made Richardson a "youth helper" on December 1, 2014. Espinosa Decl. ¶¶ 1–3. Regardless of whether this was a group or individual decision, or whether it occurred on November 25 or December 1, a single designation as "youth helper" is not enough to persuade me that the entirety of the missing records would have supported defendants' argument when there is substantially more evidence supporting Doe's position.

16

case." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006)(quotation marks and alterations omitted). "The test for prejudice is whether there is a reasonable possibility, based on concrete evidence, that access to the evidence which was destroyed or altered, and which was not otherwise obtainable, would produce evidence favorable to the objecting party." *Hamilton*, 2005 WL 3481423, at *8 (quoting another source).

"Where a non-spoliating party has other evidence to prove its case, the degree of prejudice is lower, and a court may decline to impose adverse inference sanctions." *Toppan Photomasks, Inc. v. Park*, No. 13-CV-03323-MMC (JCS), 2014 WL 2567914, at *9 (N.D. Cal. May 29, 2014). Defendants argue that Doe's motion "make[s] clear" that sanctions are not appropriate because he has other evidence to prove the points he argues would be reinforced by the missing evidence. Opp'n at 17; *see* Mot. at 15 ("Such documents [daily housing records] potentially provide further evidence of Defendants' awareness of Richardson's dangerous propensities before Defendants placed Richardson in a cell with Plaintiff."). They make the same argument regarding the "non-existent video recordings[.]" Opp'n at 17.

As previously mentioned, even if Doe was able to establish that the video recordings existed at some point, he has other evidence proving that "more than 15 minutes had elapsed between room checks." 1/16/15 Silver After Action Report (Hurley Decl. ¶ 56; *id*., Ex. M); *see id*. (noting that the safety check logs revealed "several instances," including a lapse of 28 minutes on December 5th and 34 minutes on December 3rd). Doe urges that the recordings would have established the degree to which timely safety checks were missed, especially in light of the apparent alterations to the safety check log on December 3, 2014. *See* Thompson Decl. ¶¶ 5–7; *id*., Exs. FF and GG. But I disagree that the alteration suggests anything sinister; rather, it appears to be an inadvertent mistake in documenting the accurate military time. Accordingly, I am not convinced that the video recordings, if they existed, would show anything other than what the safety check logs already demonstrate—the County failed to conduct timely safety checks. Doe suffers little to no prejudice from the missing recordings.

The missing room assignments and classification forms, however, are far more troubling. These records documented Richardson's housing situation in the weeks leading up to the two

17

assaults on Doe. They would provide critical insight into how Richardson was classified, and what may have led to the decision to house him with Doe. It would certainly be easier for Doe to point to records and argue deliberate indifference than it will be for him to point to a lack of records to argue the same. And defendants will suffer no similar degree of prejudice. They will be disadvantaged in having to take the stand and testify as to the custom and practice of making housing assignments,[10] but they will not be in the position of having to explain their decision in the face of convincing evidence suggesting it was the wrong decision. This clearly "force[s Doe] to rely on incomplete and spotty evidence[,]" *In re Hitachi Television Optical Block Cases*, No. 08CV1746 DMS NLS, 2011 WL 3563781, at *11 (S.D. Cal. Aug. 12, 2011), and may "interfere with the rightful decision of the case." *Leon*, 464 F.3d at 959.

### C. Availability of Lesser Sanctions

Defendants insist that Doe has failed to establish that they consciously disregarded any obligation or otherwise acted in bad faith, so *any* sanction would be inappropriate. Opp'n at 19; *see Hamilton*, 2005 WL 3481423, at *9 ("Given that Plaintiffs have not shown that Signature engaged in egregious conduct, any lesser sanction would also be inappropriate."). But defendants' gross negligence is a sufficient degree of fault to justify granting the requested sanctions under the circumstances of this case. *See Unigard*, 982 F.3d at 367 (noting the court's "broad discretion to fashion, on a case-by-case basis, an appropriate sanction").

## CONCLUSION

Doe's request for an order precluding defendants from introducing any witnesses or expert testimony or evidence that they performed safety checks in a timely manner on the nights of the assaults is GRANTED.

His request for an adverse inference instruction is also GRANTED, with revisions. I will instruct the jury as follows:

> Defendants failed to prevent the destruction of or preserve records including the records of where and with whom ward Richardson was

---

[10] During the hearing, defense counsel indicated that no one with personal knowledge is available to testify and defendants will rely on the County's custom and practice in making housing assignment determinations.

18

housed for the month prior to the assaults on Plaintiff, records of housing assessments and classification records.

I instruct you, as a matter of law, that Defendants failed to preserve evidence after their duty to preserve arose. This failure resulted from the Defendants' failure to perform their legal duty under State and Federal law, and their discovery obligations in this case.

You may presume the following facts to be true and that Plaintiff has met his burden of proving the facts by a preponderance of the evidence:

First, that relevant evidence was destroyed after the duty to preserve arose. Evidence is relevant if it would have clarified a fact at issue in the trial and otherwise would naturally have been introduced into evidence; and

Second, the destroyed or lost evidence was favorable to Plaintiff; and

Third, that housing records and housing assessment and classification records would have established that Defendants did not perform required housing classification and housing assessments for Plaintiff's safety in the face of a threat of harm posed by Richardson to Plaintiff.

Whether these findings are important to you in reaching a verdict in this case is for you to decide. You may choose to find all or one of them to be determinative, somewhat determinative, or not at all determinative in reaching your verdict.

**IT IS SO ORDERED.**

Dated: December 29, 2017

William H. Orrick
United States District Judge